# UNITED STATES DISTRICT COURT
# IN THE SOUTHERN DISTRICT OF ILLINOIS
# BENTON DIVISION

| | | |
|---|---|---|
| JANE DOE 77, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 3:12-cv-00268-MJR-PMF |
| vs. | ) | |
| | ) | |
| MASSAC UNIT SCHOOL DISTRICT #1, | ) | |
| a corporation, WILLIAM HATFIELD, | ) | |
| DONALD SMITH, REUBEN BREMER, | ) | |
| and DARRYL BENTSON, | ) | |
| | ) | |
| Defendants. | ) | |

**MOTION TO QUASH SUBPOENA AND/OR MOTION TO RECONSIDER PLAINTIFF'S MOTION TO QUASH BY NON-PARTIES SURVIVOR'S NETWORK OF THOSE ABUSED BY PRIESTS AND BARBARA DORRIS**

COME NOW the Survivors Network of those Abused by Priests (hereinafter referred to as "SNAP") and Barbara Dorris (hereinafter referred to as "Dorris"), both non-parties to the above litigation, by and through the undersigned counsel, and for their Motion to Quash Subpoena and/or Motion to Reconsider Plaintiff's Motion to Quash, state as follows:

## I. INTRODUCTION

SNAP is the largest, oldest and most active support group for women and men wounded and abused by religious authority figures (priests, ministers, bishops, deacons, nuns and others). SNAP is incorporated in Illinois, but has staff in Missouri as well. SNAP informs victims and survivors of abuse that it is a confidential organization. SNAP is a non-profit, certified 501(c)(3) organization and has no connections with any church or church officials. SNAP offers support to victims of sexual abuse and assault in a variety of ways, including in person through monthly self-help group, phone consultations, providing information to victims, counseling, and any other assistance survivors of abuse seek. SNAP also performs advocacy work on behalf of victims to

1

prevent future abuse by helping victims hold abusers, and the organizations that protect them and/or enable the abuse, publicly accountable. Dorris is employed by SNAP and works from her home in St. Louis, Missouri.

Defendants served a subpoena on SNAP and Dorris requesting documents relating to their advocacy work in the case of Plaintiff Jane Doe 77. Plaintiff filed a motion to quash the subpoena. On May 2, 2013 [doc. # 158], the Court denied Plaintiff's motion to quash and ordered an *in-camera* review of the responsive documents in SNAP's possession. The Court further amended the subpoena by deleting the phrase "regarding referrals or statements of any pending or threatened litigation" from the last sentence of the subpoena attachment. SNAP's understanding of the modification to the subpoena is that the Court has amended the subpoena so as to only require the production of documents specifically related to Plaintiff Jane Doe 77, and not any other pending or threatened litigation. If this was not the Court's intent, SNAP respectfully requests further clarification and direction from the Court in the event that this instant motion is denied.

SNAP and Dorris respectfully request that this Court quash the subpoena directed to them and further order that any documents or communications in their possession are confidential and protected from disclosure under the "rape crisis center" privilege.

**II.  ARGUMENT**

    **A. This Court Should Recognize a Federal Privilege Protecting Communications with a Rape Crisis Center.**

Federal Rule of Evidence 501 governs privileges in cases that are not based in diversity jurisdiction, such as this case. Rule 501 provides that "the privilege of a witness, person, government, State or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason

2

and experience." Fed.R.Civ.P 501. Therefore, a federal court may consider whether or not a state law privilege should be recognized by the federal court. "A strong policy of comity between state and federal sovereignties impels federal courts to recognize state privileges where this can be accomplished at no substantial cost to federal and substantive policy." *Memorial Hospital v. Shadur*, 664 F.2d 1058, 1061 (7th Cir. 1981). In 1996, the United States Supreme Court created a federal privilege for communications between a psychotherapist and clinical social workers and their patients. *Jaffee v. Redmond*, 518 U.S. 1 (1996). In *Jaffee*, the Court held that it was appropriate for the federal courts to recognize a psychotherapist privilege under Rule 501, in part, because all 50 states had enacted some form of psychotherapist privilege. *Id.* at 12. The Court reasoned that "any State's promise of confidentiality would have little value if the patient were aware that the privilege would not be honored in a federal court ... Denial of the federal privilege therefore would frustrate the purposes of the state legislation that was enacted to foster these confidential communications." *Id.*

At least one federal court has specifically adopted a privilege for communications and documents exchanged between a rape crisis center and victims of sexual abuse. See *U.S. v. Lowe*, 948 F. Supp. 97 (D. Mass. 1996) ("In light of the policies expressed in *Jaffee*, this Court agrees that a client of a rape counseling center holds some form or federal privilege for communications with a rape crisis counselor, a privilege that the client can waive."). *U.S. v. Lowe* is the only federal case SNAP has located that specifically addresses the issue of confidentiality with a rape crisis center; however, other courts have extended the privilege under *Jaffee* to other social workers or counselors assisting victims of sexual abuse and trauma. See *Oleszko v. State Compensation Ins. Fund*, 243 F.3d 1154 (9th Cir. 2001) (extending a privilege to communications made to the Employee Assistance Program ("EAP") in an employment case for

3

sexual harassment); *Richardson v. Sexual Assault/Spouse Abuse Resource Center*, 764 F. Supp.2d 736 (N.D. My. 2011) (extending the privilege to unlicensed counselors). The majority of states have adopted some form of the rape crisis center privilege. See "Summary of U.S. State Laws Related to Advocate Confidentiality," by Julie Kunce Field and the Confidentiality Institute, 2010, which is attached hereto as <u>Exhibit A</u>. Missouri, the state where any communications at issue occurred, and Illinois, the forum state of this Court, have strong privileges in their respective state laws for rape crisis centers. It is clear that the federal courts, as they have done with the psychotherapy privilege and social worker privilege, should extend a federal common law privilege to rape crisis centers.

      The scope of the privilege differs in some respects from state to state, ranging from an absolute privilege (which can still be waived by the victim) to a qualified privilege that is subject to review by the Court. However, what many states hold in common is that, even in cases where an *in camera* review of the documents is allowed, the defendant must first make a showing that the information and documents requested is material to a defense or fact at issue in the case. In *Jaffee,* the Supreme Court rejected a balancing component of the privilege for psychotherapy that had been set by the Seventh Circuit and a small number of state laws that seemingly allowed a judge to determine the relevance of the information before ruling on its disclosure. *Id.* The Court stated that "making the promise of confidentiality contingent upon a trial judge's later evaluation of the relative importance of the patient's interest in privacy and the evidentiary need for disclosure would eviscerate the effectiveness of the privilege. As we explained in *Upjohn,* if the purpose of the privilege is to be served, the participants in the confidential conversation 'must be able to predict with some degree of certainty whether particular discussions will be

protected. An uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all.'" *Id.* at 13-14.

Here, the Defendants have not asserted any reason why the documents are necessary to their defense or any fact at issue in the case. Without any claim of relevancy or reasonably calculated to lead to the discovery of admissible evidence, it appears that the reasons for serving the subpoena are to harass SNAP and deter other victims, witnesses, whistleblowers, and others from seeking the necessary support from victim advocate groups for fear that their confidentiality is not protected. Denying the confidentiality of communications and documents provided to SNAP would create a chilling effect on victims taking that important, first step to seek help. That chilling effect, in turn, endangers children while it protects abusers and those who sometime hire and shield abusers (like schools and religious organizations) because victims will hesitate to come forward in the first place.

This chilling effect would defeat the purpose of the confidentiality laws and privileges that protect rape crisis centers. For example, the Illinois legislature specifically stated that the purpose of the law is to protect victims of rape from public disclosures "[b]ecause of the fear and stigma that often results from those crimes, many victims hesitate to seek help even where it is available at no cost to them. As a result they not only fail to receive needed medical care and emergency counseling, but may lack the psychological support necessary to report the crime and aid police in preventing future crimes." 735 ILCS 5/8-802.1(a). Therefore, SNAP and Dorris respectfully requests that the Court protect all communications as privileged, without requiring SNAP to produce any documents for an *in-camera* review.

### B. SNAP Qualifies as a Rape Crisis Center and Should be Protected From Compelled Testimony or Disclosure of Confidential Documents.

Because any and all communications regarding Plaintiff would have taken place in Missouri, and because Illinois is the home forum of this Court, the below will analyze the propriety of the subpoena under both Illinois and Missouri law.

Under Missouri law, a "rape crisis center" is defined as "any public or private agency that offers assistance to victims of sexual assault." Section 455.003.3 RSMo. Under Illinois law, a "rape crisis organization" means "any organization or association the major purpose of which is providing information, counseling, and psychological support to the victims of any or all crimes of aggravated criminal sexual assault..." 735 ILCS 5/8-802.1(b)(1). Because of the services SNAP provides to victims of sexual abuse, SNAP qualifies as a rape crisis center under both Missouri and Illinois state law. Therefore, the next question is to what extent the privilege may apply to the communications and documents requested by Defendants.

Under Missouri and Illinois law, any communications or documents provided to the rape crisis center related to the advocacy services provided by the center are strictly confidential. In Missouri, where the communications occurred, Section 455.003 RSMo provides that a rape crisis center shall:

(1) Require persons employed by…the rape crisis center to maintain confidentiality of any information that would identify individuals served by the center and any information or records that are directly related to the advocacy services provided to such individuals.

In Illinois, Section 5/8-802.1 defines confidential communications as follows:

(b)(4) "Confidential communication" means any communication between a victim and a rape crisis counselor in the course of providing information, counseling, and advocacy. The term includes all records kept by the counselor or by the organization in the course of providing services to an alleged victim concerning the alleged victim and the services provided.

(c) Waiver of the privilege.
   (1) The confidential nature of the communication is not waived by: the presence of a third person who further expresses the interests of the victim at the time of the communication ... or disclosure to a third person with the consent of the victim when reasonable necessary to accomplish the purpose for which the counselor is consulted.
(d) Confidentiality. Except as provided in this Act, no rape crisis counselor shall disclose any confidential communication or be examined as a witness in any civil or criminal proceeding as to any confidential communication without the written consent of the victim or a representative of the victim…

Illinois law provides a very limited exception to the privilege of communications with a rape crisis center. The first section, 735 ILCS 5/8-802.1, protects any communication "in the course of providing information, counseling, and advocacy." 735 ILCS 5/8-802.1(b)(4). Further, the "confidential nature" of the communication is not waived by a disclosure to a third party "when reasonably necessary to accomplish the purpose for which the counselor is consulted." The next section of the law, 735 ILCS 5/8-802.2, carves out an exception that allows the Court to perform an *in camera* review as to the relevancy of statements by a victim "where the victim of a violent crime makes a statement relating to the crime or its circumstances during the course of therapy or consultation" and a "party alleges that such statements are necessary to the determination of any issue before the court." 735 ILCS 5/8-802.2(c). The difference between the two sections is meaningful. In Illinois, there is a nearly absolute privilege for communications with a rape crisis center, with the only exception providing for an *in camera* review when statements are made about the <u>facts</u> of the alleged crime during the course of counseling.

In this case, SNAP does not possess any documents pertaining to the facts or circumstances of the crime as stated by the victim to a counselor. In fact, as is clear by the subpoena, Defendants do not even seek any such documents. Instead, the Defendants have

requested documents between SNAP and Dr. Peterson and SNAP and Plaintiff's attorneys, Chackes, Carlson & Halquist, LLP. These communications (if indeed any exist), although not between the victim and SNAP, should nevertheless be held confidential because the victim holds a confidential relationship with both her physician and attorneys, and any communications between those parties were made in furtherance of the advocacy work performed by SNAP on behalf of Plaintiff. The fact that the communications were between SNAP and Plaintiff's attorneys does not break the confidentiality of the communications as the third party (Plaintiff's attorneys) were "expressing the interests" of the Plaintiff at the time of any communication. See, e.g., 735 ILCS 5/8-802.1(c). SNAP did not have any communications with Dr. Peterson, however, if it did, such communications should be shielded from disclosure for the same reasons.

> C. **The Subpoena Requests Confidential Documents That Are Not Relevant to any Legal Issue, Fact or Defense at Issue in this Case and Shows that the Discovery Is Improper and a Tactic to Harass, Annoy and Oppress SNAP, its Employees and the Survivors and Victims of Abuse.**

For virtually all of SNAP's first 23 years, no defendant ever sought depositions or records from the organization's staff. In the last two years, however, a number of them suddenly began doing so, thereby hurting SNAP's effective support and advocacy work. It is clear that, because SNAP devotes a portion of their advocacy work to supporting victims in the press and holding abusers publicly accountable, abusers and their lawyers are now targeting SNAP and similar organizations by subpoenaing their records, seeking depositions and causing them to seek counsel to defend itself, in order to impede their ability to assist victims in seeking justice and prevent future abuse. This case makes this motive abundantly clear, as the Defendants initially requested documents relating to "referrals or statements of any pending or threatened litigation" -- a subject that has nothing to do with the actual facts of the case or whether or not this victim

was abused or the extent to which the school and its administrators knew of the abuse or failed to act to protect a child enrolled in their school.

SNAP is asking this Court to put a stop to these types of litigation tactics that seek confidential documents and communications only to harass organizations like SNAP, who support victims and hold abusers accountable for their conduct and the life-long pain and trauma they have caused their victims, by upholding the confidentiality of their communications in the course of their advocacy work. SNAP is a non-profit with a small paid staff, and the harassment caused by Defendants and other accused sexual abusers causes this organization to lose time and energy defending against litigation and subpoenas, when their time should be spent helping victims get the help and support they need and deserve.

The district courts in the 7th Circuit have held: "If it is established that confidential information is being sought, the burden is on the party seeking discovery to establish that the information is sufficiently relevant and necessary to his case to outweigh the harm disclosure would cause to the person from whom he is seeking the information." *Litton Industries, Inc. v. Chesapeake & O. R. Co.*, 129 F.R.D. 528, 530 (E.D. Wisc. 1990) (citing *Shields Enterprises, Inc. v. First Chicago Corporation*, 1988 U.S. Dist. LEXIS 14950, *4 (N.D. Ill. 1988), further citing 8 C. Wright & A. Miller, *Federal Practice and Procedure,* § 2043 at 301 (1970)); see also *Greater Rockford Energy and Technology Corp. v. Shell Oil Co*., 138 F.R.D. 530, 534 (C.D.Ill. 1991) (the party seeking discovery from a non-party has the burden to show that the information is sufficiently relevant and necessary to its case to outweigh the harm disclosure would cause to the party from which the information is sought).

Defendants have made no showing as to why they need documents from SNAP and why or how the documents or information they seek could not be gained through other avenues.

9

Indeed, they have not even attempted to do so. SNAP is not a party in this litigation, and should not be compelled to testify or provide documents when their work and purpose is strictly to provide help and assistance to victims of abuse and try to prevent future abuse. SNAP has no relevant information to add to this proceeding, but the larger, more important issue is that even if it had relevant information in its possession (which it does not) an organization like SNAP should be protected from being dragged into time-consuming litigation such as this.

WHEREFORE, SNAP and Barbara Dorris respectfully requests that this Court order the subpoena quashed and further order that Defendants pay its reasonable attorneys' fees and costs in litigating this issue, and for such other and further relief as this Court deems just and necessary under the circumstances.

Respectfully submitted,

**PLEBAN & PETRUSKA LAW, LLC**


By:  /s/ *Brandy B. Barth*
Lynette M. Petruska
Brandy B. Barth
2010 S. Big Bend Blvd.
St. Louis, MO 63117
(314) 645-6666
(314) 645-7376 (FAX)
lpetruska@plebanlaw.com

Attorneys for Non-Parties
SNAP and Barbara Dorris

## Certificate of Service

      I hereby certify that on the 24th day of May, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to all counsel of record.

                                                      /s/ *Brandy B. Barth*